**JAY PENA, MBA, LEAD COUNSEL (SBN: 24093853 | SDTX: 2515182)**
j.pena@popepena.com

**JOHN ADAM POPE IV (SBN: 24092978| SDTX: 2573155)**
j.pope@popepena.com

**POPE & PENA P.C.**
200 N. Britton Ave.
Rio Grande City, TX 78582
P: 956-266-7858 | info@popepena.com

**Attorneys for the Defendant/Counter-Claimants, Roberto Salinas III and Leidy M. Alaffa**

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **Ediel Barrera and Regina Enterprises, LLC**<br>Plaintiffs/Counter-Defendants | CASE NO. 7:23-cv-00281 |
| | STATE COURT CASE NO: DC-23-348 |
| VS. | [REMOVED FROM THE 229TH JUDICIAL DISTRICT COURT OF STARR COUNTY, TEXAS] |
| **Roberto Salinas III and Leidy M. Alafa**<br>Defendants/Counter-Claimants | |
| VS. | **ORIGINAL ANSWER & COUNTER COMPLAINT FOR DAMAGES** |
| VERONICA BARRERA and | 1. Violations of the Truth in Lending Act (TILA), 15 U.S.C. 1601 et seq. (as affirmative defense of offset per § 1640)<br>2. Violations of the Fair Debt Collection Practices Act (FDCPA)<br>3. Violations of Texas's Debt Collections Act (TDCA), *TX FIN § 392 et seq*<br>4. Violations of Texas's Deceptive Trade Practices-Consumer Protection Act (DTPA), V.T.C.A., Bus. & C. Code § 17.41 et seq.<br>5. Fraudulent Misrepresentation<br>6. Fraudulent Concealment |

1

COME NOW ROBERTO SALINAS, III and LEIDY M. ALAFA (the "Defendants" or "Counter-Claimants") who file this original answer and counterclaim, showing unto the court the following:

## I. JURISDICTION AND VENUE

The Defendants removed this cause of action from the 229th Judicial District Court of Starr County, Texas in accordance with 28 U.S.C.A. § 1446(b)(2)(a) (federal question). The Defendants invoke the Truth in Lending Act's (TILA) Civil Liability provisions at 15 U.S.C.A. § 1640(e) and (h), which provide for jurisdiction of TILA actions in the U.S. District Courts. In the alternative, the Defendants assert causes of action under the Fair Debt Collections Practice Act (FDCPA), which sets jurisdiction in the U.S. District Courts under 15 U.S.C.A. § 1692k(d).

## II. DENIALS

1. The Defendants herein specifically *deny* the jurisdictional provisions in paragraphs 5-8 of the Plaintiffs' state-court pleading to the extend they imply this U.S. District Court is lacking jurisdiction.

2. The Defendants herein specifically *deny* the following statements in the Plaintiffs' state-court pleading:

    a. Paragraph 10 – "Rather, the Defendants negotiated a private lending agreement with Regina Enterprises, LLC and Ediel Barrera." The Defendants deny the foregoing statement to the extent that it assumes a written agreement. They, furthermore, deny the statement on the basis that there was no negotiation.

   b. Paragraph 10 – "To complete the construction of the home, Regina Enterprises, LLC and Ediel Barrera would finance the remaining $72,066.00." The Defendants deny said amount was necessary to the completion of the home.

   c. Paragraph 10 – "The parties drafted an amortization schedule, and the monthly payment to be paid by Defendants was $1,513.52." The Defendants deny the foregoing statement to the extent that it assumes the Defendants partook in the drafting of an amortization schedule.

   d. Paragraph 10 – "After the home was completed. Defendants began making monthly payment of $1,513.52 on April 2019." The Defendants deny the foregoing statement to the extent it alleges the payments tendered by the Defendants were for "$1,513.52" consistently.

   e. Paragraph 17 – The Defendants deny this paragraph to the extent it assumes TX CIV PRAC & REM § 38.002 was followed with regard to the procedure prescribed for the eligibility of attorney's fees and costs. The Defendants further deny any other basis for the awarding of attorney's fees or costs to the Plaintiffs.

 3. The Defendants lack knowledge or information sufficient to form a belief as to the truth of the following allegations in the Plaintiffs' state-court pleading:

   a. In paragraph 10, the pleading states, "During the construction of the home, Defendants began requesting modifications and additions to the home that were not provided in the original agreement." The Defendants never received notice of, or an accounting of, the modifications or additions, so they lack knowledge or information sufficient to form a belief as to the truth of this allegation.

   b. "Said modifications and additions raised the original cost of the construction by $72,066.00." The Defendants never received notice, documentation, or an accounting of the

1  alleged modifications or additions, so they lack knowledge or information sufficient to form a
2  belief as to the truth of this allegation.
3     c.  The Defendants lack knowledge or information sufficient to form a belief as
4  to the truth of the allegation in paragraphs 12, 13, 15, and 16 because they've never received
5  notice, documentation, or an accounting of the alleged modifications or additions.

## III. AFFIRMATIVE DEFENSES

8   4.  *Statutory Right of Offset*. The Defendants, as Counter-Claimants in this pleading
9  infra., plead TILA violations. Relative to those violations, the Defendants merit an offset
10  equivalent to ascertainable damages under 15 U.S.C.A. § 1640.
11   5.  *Unclean Hands*. The Defendants, as Counter-Claimants in this pleading infra., plead
12  several causes of action. With regard to any equitable relief sought by the Plaintiffs, the
13  Defendants herein plead the doctrine of unclean hands.

## IV. FACTS

6. The Defendants contracted with Regina Enterprises, LLC to build a residential home. They received a construction loan from a bank to build and purchase the home.

7. At the time, the Defendants were employed by a therapy company called Rio Rehab that is owned, managed, or controlled by Mr. Barrera.

8. After closing on the purchase, the Plaintiffs represented cost overruns to the Defendants in the amount of $72,066.00; however, the Plaintiffs provided no information to the Defendants to substantiate the cost overruns. The Plaintiffs also did not notify the Defendants of any cost overruns or related change orders throughout the home construction process. The Plaintiffs also told the Defendants they were not paid from the closing funds and that the $72,066.00 included Regina Enterprises, LLC's consideration for building the home.

9. The Defendants were surprised by the cost overruns because they paid for their own fixtures, including toilets, door handles, and cabinet knobs. Other fixtures were covered under the contract. To this day, they do not know what the cost overruns were for.

10. And because the Defendants did not want to offend their employment relationship with the therapy company, they were compelled into a verbal, private lending agreement with Regina Enterprises, LLC to pay back the $72,066.00 cost. Regina Enterprises, LLC charged a 9.5% interest rate on a five-year term. For years, the Defendants struggled through paying both their mortgage and this loan.

11. At one point, Mr. Barrera insisted all payments on the credit transaction be tendered to him in cash directly. Accordingly, all payments tendered by the Defendants were thereafter tendered to Mr. Barrera, and not to Regina Enterprises, LLC—most in cash. A secretary at Rio Rehab was charged with collecting payments from the Defendants for Mr. Barrera. She collected

payments from other consumers who had similar credit transactions with either Regina Enterprises, LLC or Mr. Barrera. The secretary herself tendered payments to Mr. Barrera relative to the purchase of her own home.

12. The Defendants' payments have always been inconsistently tendered. For example, in August and September of 2022, they tendered "1,513.00" to Mr. Barrera. In October of 2022, they tendered "1,520.00". In some months, they tendered $1,500.00. The Defendants do not know what balance would be due, because the Rio Rehab employee never wrote the balance on their receipts, and they never received an updated accounting of the outstanding balance.

13. The Defendants tendered their last cash payment to Rio Rehab's secretary on February 9, 2023, for $1,500.00. By that time, they were no longer working for Rio Rehab and felt they'd paid enough. They had no idea about the balance, and they no longer felt the pressure of having to comply with the payment schedule while working for Rio Rehab.

14. On or about February 19th through the 20th of 2023, the Defendants received harassing text messages from Ediel's Barrera's wife, who is the registered principal of Rio Rehab. The message threatens litigation and a "more expensive and embarrassing [end result]". The message lambasts the Defendants as being ungrateful and states, "…know that the attorney fees which will be pretty high [sic] will also be added to what you currently owe us." The message is accompanied by the photo of a line of credit statement, issued by PNC Bank (account no. "50-03-506751050826"). Per Mrs. Barrera's message to the Defendants purports to have used that account to fund the $72,066.00 in overruns.

15. The Defendants had not been presented with the PNC Bank statement before. Furthermore, until Mrs. Barrera presented the PNC Bank statement, the Defendants were unaware such an accounting existed.

6

16. According to information and belief, the Defendants believe the $72,066.00 cost is fictitious. They never questioned the amount and tendered payments to Ediel Barrera for fear of retaliation from their employer, Rio Rehab. The message they received from Mrs. Barrera last February substantiates their fear.

17. The Plaintiffs are not licensed as regulated lenders, and the Plaintiffs concede or allege the private lending agreement was for personal, household use. The Plaintiffs used telephone and/or electrical transmission lines to communicate with the Defendants about the debt. Regarding information and belief, Ediel Barrera routinely collects similar debts for himself and for Regina Enterprises, LLC. On information and belief, he also collects debts for Rio Rehab.

V. CAUSES OF ACTION

(Each of the foregoing facts are incorporated into each of the following causes of action, each of which is brought in the alternative. In this section "V," the Defendants are referred to as the "Counter-Claimants" and the Plaintiffs are referred to as the "Counter-Defendants".)

*Truth in Lending Act (TILA)*

*(15 U.S.C. 1601 et seq)*

18. The Counter-Claimants are "consumers," as defined in § 1602(i), because the alleged loan was for personal, family, or household purposes.

19. Each of Mr. Barrera and Regina Homes, LLC is a "creditor," as defined in § 1602(g), because each person regularly extends consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required and is the person to whom the debt arising from the consumer credit transaction is initially payable by agreement.

20. Under 1602 (f), the alleged $72,066.00 loan constitutes a "credit transaction" because the transaction is indicative of a right granted by the Plaintiffs to the Defendants to defer payment of a debt.

21. In violation of § 1605, the Counter-Defendants failed to transparently compute the finance charge, which ought to encapsulate the aggregate of all charges exacted in conjunction with the extension of credit. By neglecting the statutory requirements, the Counter-Defendants not only veiled the true cost of the borrowed funds but also undermined the Counter-Claimants' ability to make informed financial decisions, compromising their rights under TILA to receive clear and accurate disclosure of the terms and conditions of their credit obligation.

22. In breach of the provisions set forth in §§ 1631 and 1632 of the Truth in Lending Act (TILA), the Counter-Claimants allege that the Counter-Defendants did not furnish a comprehensive and clear outline of the credit transaction's terms. Specifically, the Counter-Defendants omitted or obscured certain essential disclosures about the interest rates, payment schedules, total amounts to be repaid, and possible penalties or fees associated with the credit transaction. Such omissions deprived the Counter-Claimants of full awareness and understanding of their financial obligations and potential risks, thereby undermining TILA's mandate for transparency and full disclosure in credit dealings.

23. The Counter-Defendants failed to comply with § 1638(a). This section mandates full disclosure of specific details about the credit transaction. However, the Counter-Defendants did not provide comprehensive information about critical terms such as the amount financed, the finance charge, the annual percentage rate, payment schedules, and any potential penalties or additional charges. By skipping these disclosures, the Counter-Claimants were left without a clear picture of their financial commitments and responsibilities, in direct violation of the consumer protection goals of TILA.

24. The Counter-Defendants' communication mode to the Counter-Claimants —using telephone or electrical transmission lines—supports jurisdiction under TILA.

*Fair Debt Collections Practices Act (FDCPA)*

*(15 U.S.C. 1692 et seq.)*

25. Both Ediel Barrera and Regina Enterprises, LLC are "creditors" under § 1692a (4), because they offer or extend credit.

26. Ediel Barrera is a "debt collector" pursuant to § 1692a (6), because he regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due to

Regina Enterprises, LLC and to Rio Rehab. For the debt at bar, though he is an officer or employee of Regina Enterprises, LLC, he did not collect the debt in the name of Regina Enterprises, LLC; rather, he collected the debt in his own name (in cash). Also, he and Regina Enterprises, LLC, in the process of collecting their own debts, use Rio Rehab (via the company's secretary) as a third person to collect or attempt to collect their debts. Their use of Rio Rehab to collect the debts is indicative of a third person collecting or attempting to collect such debts.

27. The Counter-Claimants are "consumers" because, per the allegations in this cause of action, they are obligated to pay a debt.

28. In violation of 15 U.S.C.A. § 1692c (b), the Counter-Defendants communicated the debt to Mr. Barrera's wife, without the Counter-Defendants' consent, who constitutes an unauthorized third party.

29. The February 2023 communication from Mr. Barrera's wife constitutes a harassing, oppressive, or abusive communication for the collection of a debt in violation of § 1692d. The mention of impending litigation, the implication of embarrassing outcomes, and the warning of accruing high attorney fees are clear tactics meant to intimidate or pressure the Defendants.

30. The February 2023 communication also constitutes an initial written communication that was made in violation of § 1692e (11). In that initial communication, Mrs. Barrera failed to disclose that she was attempting to collect a debt and that any information obtained would be used for that purpose.

31. In violation of § 1692e (2)(A), Mrs. Barrera's February 2023 communication misrepresents the debt's character. The Counter-Defendants' unsubstantiated claim of a $72,066.00 cost overrun, combined with the belated presentation of the PNC Bank statement only in February 2023, casts significant doubt on the debt's legitimacy and amount. The timing of this

presentation, well after payments began, supports an attempt to retroactively validate an unverified claim. Additionally, Mrs. Barrera's threatening language, which veers into character defamation of the defendants, and the ambiguous debt amounts tendered over the years without clear accounting, further muddy the waters regarding the true nature and amount of the alleged debt.

32. The communication also constitutes an unfair or unconscionable means to collect or attempt to collect the debt in violation of § 1692f. The previous employer-employee relationship between Mrs. Barrera and the Counter-Claimants accentuates the undue coercion and pressure in the debt collection process. As the former employer, Mrs. Barrera's position once held significant influence over the Counter-Claimants' professional lives. When this existing power dynamic intertwines with a personal financial dispute, it leads to an inherent imbalance, making interactions prone to exploitation. The Counter-Claimants' apprehension in challenging the alleged debt, coupled with their compliance borne out of fear of professional retaliation, underscores the potentially unconscionable nature of the collection means. Thus, Mrs. Barrera's threatening communications, leveraged against the backdrop of this former relationship, demonstrates the unfair or unconscionable nature of the communication.

33. In violation of 15 U.S.C.A. § 1692g, the Counter-Defendants failed to provide any initial communication to the Counter-Claimants concerning the alleged debt prior to initiating litigation. § 1692g(a) ensures that consumers are adequately informed of the nature, amount, and source of their debt, thereby granting them the opportunity to validate or dispute the said debt within the specified thirty-day period. Alternatively, should the communication from Mr. Barrera's wife in February 2023 be construed as an initial communication, it is alleged that said communication grossly failed to comply with the requisites of § 1692g(a). Notably, the communication did not adequately inform the Counter-Claimants of their rights to dispute the debt

within thirty days, did not clarify the name of the creditor to whom the debt is owed, and did not provide a clear statement that unless the consumer disputes the debt's validity within thirty days, the debt will be assumed valid by the debt collector.

34. The Counter-Claimants assert, pursuant to § 1692e, that the Counter-Defendants violated the FDCPA when they filed a pleading in the state court during the course of debt collection that inaccurately and misleadingly portrayed the character and amount of the alleged debt. This was done in direct contravention of § 1692e(2)(A). Anticipating the Counter-Defendants' contention that formal pleadings are immune from FDCPA scrutiny, the Counter-Claimants underscore that while § 1692g(d) specifically delineates that formal pleadings are not to be viewed as initial communications, no such exclusionary language is discernible within § 1692e. This conspicuous absence of exemptive verbiage in § 1692e suggests that Congress did not intend to shield pleadings from its purview. As such, any misrepresentation within a court filing regarding the nature or sum of an alleged debt should be amenable to examination under the FDCPA, and in this case, alleged to be in violation of § 1692e(2)(A).

35. The Counter-Claimants assert that the Counter-Defendants' insistence on receiving payments in cash is not merely a matter of procedural preference, but instead embodies an "unfair or unconscionable means" of collecting the alleged debt, directly infringing upon § 1692f. A cash-only stipulation lacks the transparency, traceability, and protection that come with other payment methods, potentially endangering the Counter-Claimants and obscuring any evidence of transactions, thereby making them vulnerable to further unfounded claims of non-payment. Every individual cash payment, demanded by and subsequently rendered to the Counter-Defendants by the Counter-Claimants within the year leading up to this counter-claim, stands as a distinct violation.

*Texas Debt Collections Act (TDCA)*

*(TX FIN § 392 et seq.)*

36. As per the TDCA definitions, each of the Counter-Defendants is identified as a "Creditor", and the contested amount by the Counter-Claimants qualifies as a "Consumer Debt." Ediel Barrera stands designated as a "Debt Collector", while the Counter-Claimants each satisfy the criteria for being recognized as "Consumers".

37. The communication dispatched by Mr. Barrera's spouse falls afoul of TX FIN § 392.304(a)(4). Her monetary demand, while failing to provide clarity regarding the identity of the individual or entity to which the debt had been entrusted or is due, undermines the TDCA's directive for transparency. Concurrently, her representation of the debt's nature, magnitude, or sum is a clear contravention of § 392.304(a)(8). Furthermore, the assertion that the debt sum would be supplemented by attorney's fees, absent a corroborating statute or contractual agreement or where such augmentation is a matter of court discretion, breaches § 392.304(a)(12) and (13).

38. In violation of TX FIN § 392.304(a)(19), the Counter-Defendants filed a pleading with the state court in the process of a debt collection, and the pleading misrepresents the character and amount of the alleged debt.

39. TX FIN § 392.404 provides that, "A violation of this chapter is a deceptive trade practice under Subchapter E, Chapter 17, Business & Commerce Code, and is actionable under that subchapter."

*Texas's Deceptive Trade Practices-Consumer Protection Act (DTPA)*

*(V.T.C.A., Bus. & C. Code § 17.41 et seq.)*

40. As noted in the prior allegation above, TX FIN § 392.404 is a tie-in statute to the DTPA.

41. The Counter-Claimants allege, under § 17.46(b)(2), that the Counter-Defendants sought to take advantage of the Counter-Claimants by causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of the loan services, especially with regard to the source and accounting of the debt funds and the PNC Bank statement.

42. The Counter-Claimants allege, under Tex. Bus. & Com. Code § 17.46(b)(5), that the Counter-Defendants engaged in false, misleading, or deceptive acts by misrepresenting the amount and nature of the alleged debt, the cost overruns, and the purported lending agreement, thereby causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

43. In violation of § 17.46(b)(12), the Counter-Claimants assert that the Counter-Defendants represented that an agreement conferred or involved rights, remedies, or obligations which it did not have or involve, especially regarding the interest rates and the nature of the private lending agreement with Regina Enterprises, LLC.

44. Under § 17.46(b)(24), the Counter-Claimants allege that the Counter-Defendants failed to disclose information with the intention to induce the Counter-Claimants into a transaction they would not have entered had they been informed, especially relating to the undisclosed costs and the nature of the alleged debt.

45. The Counter-Claimants allege that, in violation of § 17.50(a)(3), the Counter-Defendants capitalized on their dual role as both employer and creditor to exploit the Counter-Claimants' lack of knowledge, ability, experience, or capacity. Given the inherent power dynamic

and trust embedded in the employment relationship, the Counter-Claimants reasonably believed they were operating under fair terms and lacked the suspicion that would ordinarily trigger deeper inquiries. The Counter-Defendants' failure to transparently detail the cost overruns, combined with the ambiguous nature of the private lending agreement, took advantage of this trust. This lack of transparency, set against the backdrop of the employment relationship, not only created an atmosphere of undue pressure but also resulted in an oppressive and abusive debt-collection practice, which is grossly unfair and runs counter to the spirit and letter of the DTPA.

46. All of the foregoing conduct was performed by the Counter-Defendants knowingly and intentionally.

*Fraudulent Misrepresentation*

47. Mrs. Barrera presented the PNC statement to the Counter-Claimants as a record of the loan proceedings between the parties, a document of which the Counter-Claimants were previously unaware.

48. As alleged in the foregoing paragraphs, the Counter-Claimants had a statutory right to receive the information on the PNC statement as a matter of transparency with regard to the loan.

49. At the time the Counter-Claimants were charged with the loan, the Counter-Defendants were fully aware, or should have been aware, of its availability. Instead, they concealed and omitted its information.

50. Mrs. Barrera, and by extension the Counter-Defendants, knew or recklessly disregarded the fact that the PNC statement had been concealed for a duration that ensured the Counter-Claimants' potential claims arising from these undisclosed transactions would be barred by the applicable statutes of limitations.

51. The Counter-Claimants, not knowing of the availability of the PNC statement, relied on the piecemeal information provided to them by the Counter-Defendants at the time they entered into the verbal loan agreement. Furthermore, they did so out of fear of questioning the matter in light of their employment relationship.

52. The Counter-Claimants Due to the unexpected revelation of the PNC statement and its undisclosed loan proceeds, the Counter-Claimants faced financial uncertainties and unwarranted emotional and monetary strains. Also, the strategic delay in revealing the PNC statement, timed to coincide with the lapse of the statutes of limitations, directly harms the Counter-Claimants, curtailing their legal remedies and placing them at an unfair disadvantage.[1] This maneuver has caused the Counter-Claimants unwarranted emotional, financial, and legal burdens.

*Fraudulent Concealment*

(To the extent the Counter-Defendants rely on any statute of limitations to preclude any of the foregoing causes of action, the Counter-Claimants plead fraudulent concealment.)

53. The fraudulent-concealment doctrine applies if two elements are proven: (1) "the defendants concealed the conduct complained of"; and (2) "the plaintiff failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim." *Abecassis v. Wyatt*, 902 F. Supp. 2d 881, 897 (S.D. Tex. 2012).

54. Mrs. Barrera's late revelation of the PNC Bank statement evidence fraudulent concealment. Initially, the Counter-Defendants presented $72,066.00 in costs without substantiation and only disclosed the bank statement years later with a threat of litigation.

55. The concealment led the Counter-Claimants into a verbal agreement based on fictitious claims, with payments made under undisclosed terms, and out of fear of professional retaliation.

---

[1] See Doc. #3 at 3-6 (arguing statutory limitations of the Counter-Claimants' TILA and FDCPA claims).

56. Given the stringent state and federal regulations governing the confidentiality of banking records,[2] the Counter-Claimants did not have access to the Counter-Defendants' specific banking activities and could not have otherwise known of the availability of the PNC Statement, underscoring their due diligence efforts.

57. The sudden presentation of the PNC statement, combined with the previous lack of transparency and the surrounding circumstances, points to a deliberate act of hiding material information with the intent to deceive.

58. Also, the strategic delay in revealing the PNC statement, timed to coincide with the lapse of the statutes of limitations, directly harms the Counter-Claimants, curtailing their legal remedies and placing them at an unfair disadvantage. This maneuver has caused the Counter-Claimants unwarranted emotional, financial, and legal burdens.

## VI. DAMAGES

The Defendants herein plea damages, for an amount to be determined at trial, pursuant to 15 U.S.C.A. § 1640; 15 U.S.C.A. § 1692k; TX FIN § 392.403 and TX BUS & COM § 17.50.

## VII. ATTORNEY'S FEES & COSTS

The Defendants/Countclaimants herein plead for reasonable and necessary attorney's fees and costs pursuant to 15 U.S.C.A. § 1640; 15 U.S.C.A. § 1692k, TX FIN § 392.403; and TX BUS & COM § 17.50.

---

[2] *See e.g.,* the Financial Modernization Act of 1999.

## VII. PRAYER FOR RELIEF

Wherefore, the Defendant/Counter-Claimants pray for judgment against the Plaintiff/Counter-Defendants as follows:

59. Declare and adjudicate all TILA violations in favor of the Defendant/Counter-Claimants for offset against all damages alleged;

60. Declare and adjudicate that the actions and conduct of the Plaintiff/Counter-Defendants, violated the provisions of the Fair Debt Collection Practices Act, the Truth in Lending Act, the Texas Debt Collections Act, Texas's Deceptive Trade Practices-Consumer Protection Act, and other relevant federal and state laws and statutes, as plead herein;

61. Award compensatory damages to the Defendant/Counter-Claimants in an amount to be determined at trial, for all losses, injuries, and damages sustained as a result of the Plaintiff/Counter-Defendants' wrongful conduct;

62. Award punitive or exemplary damages to the Defendant/Counter-Claimants in an amount to be determined at trial, for the purpose of punishing the Plaintiff/Counter-Defendants and deterring similar wrongful conduct in the future;

63. Award the Defendant/Counter-Claimants their reasonable attorneys' fees, costs, and expenses associated with this action pursuant to any statutory or contractual entitlement or, alternatively, as deemed appropriate by the Court;

64. Award pre-judgment and post-judgment interest to the Defendant/Counter-Claimants at the highest rate allowed by law; and

65. Grant such other and further relief as this Court may deem just and proper under the circumstances.

Dated: Thursday, August 31, 2023                    POPE & PENA P.C.

*[signature]*
_____
JAY PENA, MBA
JOHN ADAM POPE, IV
Attorney for Defendant/Counter-Claimants

1             [THIS SECTION INTENTIONALLY LEFT BLANK]